# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| AMAECHI ANTWAN AHUAMA, | : |
| Petitioner, | :     Civ. No. 17-6779 (PGS) |
| v. | : |
| UNITED STATES OF AMERICA, | :     **OPINION** |
| Respondent. | : |

**PETER G. SHERIDAN, U.S.D.J.**

## I.  INTRODUCTION

Petitioner, Amaechi Antwan Ahuama, has filed a *pro se* motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255. For the following reasons, this Court will deny the motion.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

Between February 2007 and October 2012, Petitioner, his co-defendants and unknown co-conspirators, worked together in an effort to steal several millions dollars in a scheme where they fraudulently induced victims to pay fees to secure non-existent funds or assets. (*See* Presentence Investigation Report, hereinafter ("PSR") at ¶ 2) The fraudulently obtained money was obtained from victims' bank accounts in multiple states including New Jersey. (*Id.* at ¶ 35)

The conspiracy had varying categories of responsibilities, which included that of a "catcher[]," "handler[]," and "account holder[]." (*Id.* at ¶¶ 26-27, 29) A catcher "primarily operated overseas and w[as] tasked with identifying potential victims of the Advance Fee Fraud" and subsequently "sent emails out in mass quantity to various email addresses." (*Id.* at ¶ 26) A handler "primarily operated in the United States, and contacted the victims by email, phone, and

sometimes in person, in furtherance of the Advance Fee Fraud. (*Id.* at ¶ 27) Finally, the "account holder" which Petitioner was identified as, "opened and/or managed one or more bank accounts used to receive fraudulently induced fee payments from the victims ("Drop Accounts"). (*Id.* at ¶ 29) The money obtained from the scheme was split between catchers, handlers and account holders. (*Id.* at ¶ 31) However, some account holders also acted as handlers and handled victims of their own. (*Id.*)

Petitioner controlled a drop account in the name of "Cell Phone Unlimited LLC," which was used to receive the fraudulently induced payments. (*Id.* at ¶ 45) In December of 2011, the Cobb County, Georgia Sheriff's Office was contacted by an individual, D.L., to report fraud. (*Id.* at ¶ 58) D.L. had already sent over $150,000 to an individual who he believed to be in Ghana. (*Id.*) D.L. also provided that he made deposits into a Bank of America account that belonged to AA Global Investments, located in Powder Springs, Georgia. (*Id.* at ¶ 59) An investigator later verified that AA Global Investments was a registered corporation in Georgia established on November 2, 2011, that listed Petitioner as the sole officer of the corporation. (*Id.* at ¶ 60) The Georgia authorities verified the existence of the Bank of America account which D.L. reported he deposited money into, and bank representatives advised that the account had numerous transfers into it and funds withdrawn locally. (*Id.* at ¶ 61) Bank of America subsequently blocked the account, prompting Petitioner to call the bank the following day. (*Id.*) The bank referred Petitioner to the Sheriff's Office, who in turn advised him to report to the office for an interview. (*Id.*) Petitioner agreed to do so but had no further contact with the law enforcement officers. (*Id.*)

The investigation also uncovered that Petitioner had filed letters of incorporation with the Georgia Secretary of State's Office for several companies between 2007 and 2011. (*Id.* at ¶ 63)

Ultimately, petitioner was arrested on January 11, 2013. (*See* PSR at ¶ 64) On October 17, 2013, Petitioner was indicted in a twelve-count second superseding indictment. (*Id.* at ¶ 4)

On April 24, 2015, Petitioner pled guilty to laundering of money instruments in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), and (B)(i), and (B)(ii). (PSR ¶ 70)

Prior to sentencing, the United States Probation Office prepared a PSR. The PSR determined that the offense carried a base offense level of 8, however because the value of the laundered funds was more than $1,500,000 but less than $3,500,000, a sixteen-level increase was imposed resulting in a 24-base offense level. (*See* PSR at ¶¶ 70, 120) Petitioner also received a two-level enhancement pursuant to United States Sentencing Guidelines (hereinafter, "USSG") § 3B1.1(a) because the offense of conviction was in violation of 18 U.S.C. § 1956. (*Id.* at ¶ 121) Additionally, a two-level increase was imposed pursuant to USSG § 2S1.1(b)(3), because (A) subsection (b)(2)(B) applied and (B) the offense involved sophisticated laundering. (PSR ¶ 122) The PSR then decreased the total offense level by two for acceptance of responsibility under § 3E1.1(a) and one level pursuant to § 3E1.1(b)(2). (*Id.* at ¶¶ 118, 128-129) Thus, the PSR calculated a total offense level of 25. (*Id.* at ¶ 130) The PSR determined a criminal history score of 0 and a corresponding criminal history category of I. (*Id.* at ¶ 163) Petitioner's total offense level and criminal history category resulted in a guideline imprisonment range of 57 to 71 months and a supervised release term of one to three years. (*Id.* at ¶¶ 160, 163)

At Petitioner's sentencing hearing on April 7, 2016, the Court granted a two-level downward variance because of the disparity in sentencing among the co-defendants which resulted in a 23-total offense level and a sentencing range of 46-57 months. (ECF No. 15-1 at 74-75) The Court sentenced Petitioner to a low-end guidelines-range sentence of 48-months followed by three years of supervised release. (*Id.* at 75)

Shortly thereafter, Petitioner appealed his sentence to the United States Court of Appeals for the Third Circuit. *United States v. Ahuama*, 686 F. App'x 82 (3d Cir. 2017). Before affirming Petitioner's conviction and sentence, the Third Circuit rejected all but one of Petitioner's claims, which was an ineffective assistance claim that it considered best suited for collateral review. *Id.* at *87.

Petitioner then filed a *pro se* § 2255 motion[1] and a subsequent amended motion in this Court. (ECF Nos. 1, 3) Petitioner raises the following claims in his petition.

1. "Counsel's performance fell below an objective standard of reasonableness at the sentencing phase of the proceedings by failing to ensure that I received the proper guideline range."

2. "District Court's failure to include the two level downward adjustment that the court had previously granted."

3. "Restitution hearing more than ninety days after I had pled guilty."

4. "District Court erred in the victim loss calculation and restitution determination by holding me responsible, both jointly and severally liable for the entire loss amount."

(ECF No. 3 at 6-10)

Respondent filed a response in opposition to petitioner's § 2255 motion. (ECF No. 15)

### III. LEGAL STANDARD FOR § 2255 MOTION

A motion to vacate, set aside or correct a sentence of a person in federal custody pursuant to 28 U.S.C. § 2255 entitles a prisoner to relief if "the court finds . . . [t]here has been such a denial or infringement of the constitutional rights of the prisoner as to render judgment vulnerable to collateral attack." 28 U.S.C. § 2255(b). "In considering a motion to vacate a

---

[1] Petitioner's first §2255 motion was administratively terminated for failure to use the proper form. (ECF No. 2)

defendant's sentence, 'the court must accept the truth of the movant's factual allegations unless they are clearly frivolous based on the existing record.'" *United States v. Booth*, 432 F.3d 542, 545 (3d Cir. 2005) (quoting *Gov't of Virgin Islands v. Forte*, 865 F.2d 59, 62 (3d Cir. 1989)) (citing R. Governing § 2255 Cases R. 4(b)). A District Court "is required to hold an evidentiary hearing 'unless the motion and files and records of the case show conclusively that the movant is not entitled to relief.'" *Id.* (quoting *Forte*, 865 F.2d at 62). The Third Circuit has stated that this standard creates a "'reasonably low threshold for habeas petitioners to meet.'" *Id.* (quoting *United States v. McCoy*, 410 F.3d 124, 134 (3d Cir. 2005) (quoting *Phillips v. Woodford*, 267 F.3d 966, 973 (9th Cir. 2001))). Accordingly, this Court abuses its discretion "if it fails to hold an evidentiary hearing when the files and records of the case are inconclusive as to whether the movant is entitled to relief." *Id.* (citing *McCoy*, 410 F.3d at 134).

## IV. DISCUSSION

### A. Claim One

In his first claim, Petitioner's asserts that trial counsel was ineffective. Petitioner was represented by Michael A. Robbins, Esq., during his criminal proceedings.

The Sixth Amendment guarantees effective assistance of counsel. In *Strickland v. Washington,* 466 U.S. 668 (1984), the Supreme Court articulated the two-prong test for demonstrating when counsel is deemed ineffective. First, the petitioner must show that considering all of the circumstances, counsel's performance fell below an objective standard of reasonableness. *See id.* at 688; *see also Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013) (noting that it is necessary to analyze an ineffectiveness claim in light of all of the circumstances) (citation omitted). A petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. *See Strickland*, 466 U.S. at 690. Under this

first prong of the *Strickland* test, scrutiny of counsel's conduct must be "highly deferential." *See id.* at 689. Indeed, "[c]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. The reviewing court must make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. If counsel makes "a thorough investigation of law and facts" about his plausible options, the strategic choices he makes accordingly are "virtually unchallengeable." *Gov't of Virgin Islands v. Weatherwax*, 77 F.3d 1425, 1432 (3d Cir. 2006) (citing *Strickland*, 466 U.S. at 690-91). If, on the other hand, counsel pursues a certain strategy after a less than complete investigation, his choices are considered reasonable "to the extent that reasonable professional judgments support the limitations on investigation." *Rolan v. Vaughn*, 445 F.3d 671, 682 (3d Cir. 2006) (citing *Strickland*, 466 U.S. at 690-91).

The second prong of the *Strickland* test requires the petitioner to affirmatively prove prejudice. *See* 466 U.S at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*; *see also McBridge v. Superintendent, SCI Houtzdale*, 687 F.3d 92, 102 n.11 (3d Cir. 2012). "This does not require that counsel's actions more likely than not altered the outcome, but the difference between *Strickland's* prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 111-12 (2011) (internal quotation marks and citations omitted).

"With respect to the sequence of the two prongs, the *Strickland* Court held that 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.'" *Rainey v. Varner*, 603 F.3d 189, 201 (3d Cir. 2010) (quoting *Strickland*, 466 U.S. at 697). Additionally, "claims of ineffective assistance of appellate counsel are also governed by the *Strickland* standard." *Lusick v. Palakovich*, 270 F. App'x 108, 110 (3d Cir. 2008) (citing *United States v. Mannino*, 212 F.3d 835, 840 (3d Cir. 2000)).

Petitioner states that "[c]ounsel's performance fell below an objective standard of reasonableness at the sentencing phase of the proceedings by failing to ensure that I received the proper guideline range." (ECF No. 3 at 6) Petitioner further argues in his reply, that the government's reliance on *Strickland* in their ineffective assistance analysis is unavailing as that precedent has been upended by the Supreme Court's recent opinion in *McCoy v. Louisiana*, 138 S. Ct. 1500 (2018).

The government responds at the outset, that Petitioner's claim is vague, however it construes the claim to challenge counsel's failure to oppose the sentencing enhancements applied. (ECF No. 15 at 5)

As previously detailed in the background section of this opinion, the PSR calculated Petitioner's total offense level by calculating, *inter alia*, two specific characteristic increases. The Court will consider counsel's performance as it relates to each.

Loss Amount Enhancement

The government argues that counsel was not ineffective, particularly because he successfully attacked the loss calculation enhancement after making compelling arguments in

favor of a downward variance in a pre-sentencing sentencing memorandum to the Court as well as at Petitioner's sentencing hearing. (*Id.* at 7) Further, they respond that even if counsel was not successful at obtaining a downward variance on Petitioner's behalf, Petitioner has failed to demonstrate how counsel's representation was deficient, when the record supported the loss amount calculated in the PSR and even Petitioner does not challenge the loss amount in question. (*Id.* at 8)

Petitioner's counsel submitted a sentencing memorandum in advance of the sentencing hearing, where he argued for a twelve-month sentence instead of the 57-71 month Guidelines-range sentence. (ECF No. 15-1 at 94) Counsel argued that Petitioner's Guidelines range was by and large attributed to the dollar amount of illegally obtained funds, which despite being a significant amount, was for the most part the result of a single deposit. (*Id.*) Counsel further argued that the sixteen-level increase to Petitioner's total offense level "overstates the criminality involved." (*Id.*)

At the sentencing hearing on April 7, 2016, counsel made multiple arguments for a variance, a relevant portion of which was as follows-

> MR. ROBBINS- The government did an excellent job investigating this case; the proofs are manifest. To, however, drive the sentencing in this case, the disposition by really the deposit of a single check in April of 2011, of almost $1.2 million, to pump up the guidelines by, I don't know, 15 or 16 levels. Although probation can and did and this Court can, the question is whether we should. Does it overstate Mr. Ahuama's role; does it overstate his conduct.
>
> It's not a money question, he certainly didn't get $1.2 million. One can certainly argue if ever there was a bell that should have rung, it was then, he should have asked about where the money's coming from, of course. It's just – the guidelines are onerous here. And we understand their application.
>
> And that's why we make a respectful request to this Honorable Court to consider a variance for the reasons we set forth in our

memo, for the reasons we argue today, and to have a sentence that is proportional to the other dispositions the other roles, and perhaps the other people – I say people; their character, the nature of the individuals involved. There were some people in a similar situation as my client, and there was some absolute scoundrels.

(ECF No. 15-1 at 57-58)

Before sentencing Petitioner, the Court provided the basis for its sentence, a portion of which was as follows-

The offense is very serious. There were a substantial amount of people that were defrauded out of money. I'll just read one paragraph of the report. According to the investigating FBI agent: There were 70 victims defrauded as a result of the total conspiracy; some of which Mr. Ahuama had nothing to do with, but others that he did. The FBI advised that of the 70 victims, only 19 were identified and located by the law enforcement authorities, and that's because many of the other victims had died during the course of the investigation, because they were old and elderly people.

And it just goes to show the individuals involved in this scheme were taking advantage of the elderly people in our society, and defrauding them of their life's savings. It's very heinous.

So, I do find that based on that the offense is serious, and there's a need to provide just punishment, and there's a need to provide adequate general deterrence to prevent this conduct from happening the future. So, those would be the reasons for my sentence.

I do agree, only in a few aspects of Mr. Robbins' statement, that we should have an individualized approach to the sentence, as opposed to lumping Mr. Ahuama in with all the other co-defendants, so I've looked at that. And generally, there is a need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct.

. . .

So, rather than imposing a guideline sentence of a 25 and a category 1, the Court would vary down because of the disparity in the sentencing. I should also take into account that Mr. Ahuama has been on electronic monitoring, so he's been confined to his

> home, so to speak. Not that you usually get credit for that, but
> that's another thought that's in my mind that might deal or concern
> a variation from the guideline level.

(ECF No. 15-1 at 72-74)

Firstly, despite Petitioner's argument that *Strickland's* ineffective assistance of counsel framework no longer applies, the Court disagrees. The Supreme Court's ruling in *McCoy v. Louisiana*, had less to do with undermining the well-established ineffective assistance of counsel standard articulated in *Strickland*, and more to do with the limits of counsel's ability to make the ultimate decision of conceding guilt or maintaining innocence. *McCoy*, 138 S. Ct. 1510-12. Therefore, the Court will apply the *Strickland* standard in its analysis of Petitioner's instant § 2255 motion.

Here, the record reflects that the Court considered counsel's arguments in favor of a significantly lower sentence than the recommended Guidelines range sentence. Petitioner does not come forward with what additional arguments counsel could have made. When fashioning an appropriate sentence, the Court articulated, *inter alia*, its concern about the gravity of the offense, particularly the number of victims affected by the conspiracy. The Court had the benefit of learning of the very sad fates of some of the victims, whose financial and consequently physical conditions were debilitated because of the effects of the conspiracy. (PSR ¶¶¶ 102-03, 106-09) Therefore, because of the lack of specificity in his claim, Petitioner, while unsatisfied with the 48-month sentence, has not established how he was prejudiced by a below-Guidelines sentence. This Court will not address whether counsel's performance was deficient, as Petitioner has not established any prejudice as a result of counsel's representation.

## Sophisticated Money Laundering Enhancement

To the extent that Petitioner also argues that counsel was ineffective for not challenging the two-level increase imposed because of the enhancement for sophisticated money laundering under U.S.S.G. § 2S1.1(b)(3), this claim equally fails. The government argues "evidence of 'sophisticated laundering' in Ahuama's scheme was extensive." (ECF No. 15 at 9)

Petitioner unsuccessfully challenged the two-level increase on direct appeal, however it was not within the context of an ineffective assistance claim. *See Ahuama*, 686 F App'x 82 at 85-86.

Sophisticated laundering typically involves the use of-

(i)     fictitious entities;

(ii)    shell corporations;

(iii)   two or more levels (i.e., layering) of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate; or

(iv)    (iv) offshore financial accounts.

U.S.S.G. § 2S1.1.(b)(3), App. Note 5.

Petitioner's conduct is consistent with sophisticated money laundering for the Guidelines enhancement purposes. The record reflects that the conspiracy involved, *inter alia*, the creation and use of shell companies to further the conspiracy. (PSR ¶¶ 55-57) Petitioner has failed to demonstrate how counsel was ineffective for failing to challenge this enhancement. *See United States v. Sanders*, 165 F.3d 248, 253 (3d Cir. 1999) ("[t]here can be no Sixth Amendment deprivation of effective counsel based on an attorney's failure to raise a meritless argument.") Therefore, he was not prejudiced by counsel's failure to challenge the enhancement.

<u>Loss Amount</u>

In his reply, Petitioner also argues that his counsel failed to challenge "the overcharging of the Defendant with $1.6 million in loss, when they knew (and intentionally hid) at trial that they could only prove $700,000 in loss, means the Defendant's trial attorney cost the Defendant more prison time." (ECF No. 17 at 1-2) The government responds that Petitioner's claim fails because the restitution amount ordered was not a reflection of the loss amount but rather a reflection of the accounting of losses suffered as provided by the relatively few number of victims who came forward to be interviewed by the Probation office. (ECF No. 15 at 8)[2]

The record reflects that Petitioner was ordered to pay restitution in the amount of $698,615.63 at a restitution hearing which took place four months after his sentencing. (ECF No. 15-1 at 78, 90) At that hearing, the government represented to the Court the following information, which is relevant in assessing this claim-

> I'd just like [sic] set forth for the record the Government's position, your Honor. So we have submitted a sentencing memo in anticipation of the sentencing earlier this year, and we had indicated a loss amount of 1.6 million, or specifically $1,656,415.63, that was referenced in the sentencing submission for purposes of the guidelines calculation.
>
> At the sentencing hearing, your Honor, in addition to our argument with respect to that loss number, Mr. Ahuama submitted a consent order- sorry; the parties had submitted a consent order for forfeiture for a money judgment in that same amount acknowledging that the $1.6 million that went through the Cellphone Unlimited accounts as its's been referred to in our submission, I also believe in the indictment that those funds were criminal proceeds.
>
> However, as your Honor is no doubt aware and as set forth in the presentence report for Mr. Ahuama and for many of his co-defendants that there was a limited number of victims that actually came forward to probation to provide an accounting of losses that

---

[2] Out of the seventy victims that were defrauded in the conspiracy, the FBI advised that only nineteen victims were identified and located by law enforcement authorities. The FBI advised that most of the victims were advanced in age and had passed away since the offenses occurred. (PSR ¶ 100)

they had suffered as a result of the conspiracy. The number that has been set forth and was the restitution amount ordered for some of the other co-defendants in this case was $652,800 in restitution.

For Mr. Ahuama's PSR there was an additional number of $45,815 – sorry; $45,815.63 for victim D.L. and as set forth in the PSR, victim D.L. was a victim of relevant conduct by Mr. Ahuama that was not attributable to other victims. As a result, the PSR had recommended, and that's in I believe paragraphs 10, 14, and 58 through 63, that the total amount of restitution owed by Mr. Ahuama would be $698,615.63. And I misspoke to this citations; it would be paragraphs 109-A and 173.

Your Honor, in light of the fact that there are additional victims that the Government had referred to in its sentencing submission but that those victims not provided an accounting yet to probation and because we don't want this to be prolonged any further, we believe that it is appropriate for this Court to issue a restitution order in the amount set forth in the PSR, again, that $698,615.63.

(ECF No. 15-1 at 80-81)

The Court begins by pointing out that Petitioner pled guilty and did not go to trial, thus, undermining his argument that the government " . . . knew (and intentionally hid) at trial that they could only prove $700,000 in loss." Moreover, Petitioner has not demonstrated how he was prejudiced by his counsel's purported failure to challenge a charging decision when the $1.6 million loss amount was accurate. Petitioner appears to be conflating the loss amount with which he was personally found responsible for, with the restitution amount which was determined after a restitution hearing further along in the case. Therefore, Petitioner's claim is denied.

Consequently, all of Petitioner's ineffective assistance claims are denied.

B. Grounds Two and Three

Petitioner's second, and third claims are all matters that were previously raised and adjudicated on direct appeal. *See Ahuama*, 686 F. App'x at 84-86. In its answer, the government

asserts that these claims are barred from collateral review, and in his reply, Petitioner concedes that these claims are in fact barred. (ECF Nos. 15 at 3-5, 17 at 1)

The instant claims are identical to those unsuccessfully raised on direct appeal. *See United States v. DeRewal*, 10 F.3d 100, 105, 106 n.4 (3d Cir. 1993) ("Many cases have held that Section 2255 generally may not be employed to relitigate questions which were raised and considered on direct appeal.") (citations and internal quotation marks omitted)). Therefore, Petitioner is precluded from raising these claims in the instant motion.

Accordingly, grounds two and three of the instant motion are denied.

## C. Ground Four

In Petitioner's fourth ground for relief, he argues that he "was erroneously held responsible for the proposed loss amount of $1,656,415.63 without considering the extent of the participation of the other participants in the criminal activity." (ECF No. 3 at 10). Petitioner submits that this proposed loss amount resulted in the sixteen-level sentence enhancement imposed. (*Id.*) The government responds that this claim is barred because Petitioner raised it within the context of his unreasonable sentence claim on direct appeal.[3] (ECF No. 15 at 4) In his reply, Petitioner appears to have adopted the government's argument that this claim is barred from re-litigation. (ECF No. 17 at 1). However, the Court does not consider the instant claim to be identical to that raised on direct appeal. The Third Circuit characterized Petitioner's similar claim as follows- " . . . the Court erred by failing to address his argument that the guidelines range was unfairly inflated because of a single deposit of $1.2 million into his drop account that greatly increased the amount of the loss calculation." *See Ahuama*, 686 F. App'x at 84. While at first blush, the two claims may appear to be alike, the Court considers the instant claim to be an

---

[3] The Court agrees that any claim adjudicated on direct appeal cannot be revisited by this Court in a § 2255 motion. See *DeRewal*, 10 F.3d 100 at 106 n.4. To the extent that this claim was raised on direct appeal, this claim is barred.

argument that Petitioner's Guidelines' calculation was based on a significant loss value amount, but should have been considered within the context of his co-conspirators' actions. Whereas his claim on direct appeal appeared to be challenging the enhancement in light of the infrequency of the deposits into Petitioner's drop account.

Notwithstanding the nuanced argument, Petitioner's claim is barred from review in a collateral relief motion because it could have been raised on direct appeal but was not. *See Massaro v. United States*, 538 U.S. 500, 504 (2003) ("The procedural default rule is neither a statutory nor a constitutional requirement, but it is a doctrine adhered to by the courts to conserve judicial resources and to respect the law's important interest in the finality of judgments." ). A section 2255 Petitioner has procedurally defaulted all claims he has not raised on direct appeal. *See Hodge v. United States*, 554 F.3d 372, 379 (3d Cir. 2009). Moreover, Petitioner has not demonstrated either "cause" and "prejudice" required to overcome the procedural bar nor has he established his actual innocence. *See Bousley v. United States*, 523 U.S. 614, 622-23 (1998).

Therefore, Petitioner's fourth ground for relief is denied.

## V. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2255. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller–El v. Cockrell,* 537 U.S. 322, 327

(2003). Applying this standard, the Court finds that a certificate of appealability shall not issue on the claims.

## VI.    CONCLUSION

Petitioner's claims are denied and the Court will not grant an evidentiary hearing. A certificate of appealability will not issue on these denied claims. An appropriate order will be entered.

DATED:  November 5, 2019

PETER G. SHERIDAN
United States District Judge